**Balarangini RATNAM, Petitioner,**

v.

**Warren LEWIS, District Director, Immigration and Naturalization Service, Respondent.**

**Civ. A. No. 95–1922.**

United States District Court, D. New Jersey.

June 20, 1995.

**620**

Chin Wei Fong, Shih, Fong & Suh, LLC, Visuvanathan Rudrakumaran, Assadi & Rahmanan, New York City, for petitioner.

Faith S. Hochberg, U.S. Atty. by Daniel J. Gibbons, Asst. U.S. Atty., Newark, NJ, for U.S.

## OPINION

DEBEVOISE, Senior District Judge.

Petitioner, Balarangini Ratnam, challenges the failure of the United States Department of Justice to grant her either asylum or withholding of deportation and seeks the issuance of a writ of habeas corpus. On April 28, 1995, I held a hearing on petitioner's application. Thereafter, the respondent, Warren A. Lewis, District Director, Immigration and Naturalization Service, filed the entire administrative record, which I have reviewed. For the reasons set forth below, the petition will be granted.

### I. THE ADMINISTRATIVE PROCEEDINGS

A. *The INS Hearing:* Petitioner, a native of Sri Lanka, arrived in New York on September 22, 1994. She did not appear to be admissible to the United States and was placed in exclusion proceedings by the issuance of a Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge. The Notice charged petitioner with excludability under Sections 212(a)(7)(B)(i)(II), 212(a)(7)(B)(i)(I) and 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act. Petitioner was detained in custody.

In November 1994, with the assistance of counsel, petitioner filed a Request for Asylum in the United States. The request recited that petitioner was born on March 18, 1959 in Northern Sri Lanka, that her race/ethnic or tribal group is Tamil and that her religion is Hindu.

In response to the question about political membership she stated: My husband was first a member of the Tamil United Liberation Front. Then, he joined the Liberation Tigers of Tamil Eelam and worked in their propaganda section.

She asserted that she or a member of her family had been mistreated or threatened by authorities of her home country or by groups controlled by or beyond the control of the

government of her home country by reason of her race, nationality, membership in a particular social group and political opinion. She summarized the mistreatment as follows:

> In September 1988 my husband and I were arrested by the IPKF [the Indian Peace Keepers Force] and the EPRLF [the Eelam People's Revolutionary Liberation Front, a Tamil group opposed to the Liberation Tigers of Tamil Eelam], detained and abused. We were detained till May 1989.

> In November 1992 my husband and I were arrested again by the Sri Lankan armed forces, detained and tortured. We were released in August 1994.

Attached to the Request was a detailed recital of the events leading to the two detentions, the brutality which occurred during the periods of detention, and the circumstances of petitioner's flight from Sri Lanka and her husband's abortive flight. The Request recited that "since my departure, the opposition leader has been assassinated. After the assassination hundreds of Tamil youth in Colombo have also been arrested on the [suspicion] that they are members or supporters of LTTE [Liberation Tigers of Tamil Eelam]."

On November 11, 1994, petitioner attended an asylum prescreening interview. The interviewer's worksheet and recommendation summarized petitioner's account of what had happened to her and her husband. The interviewer concluded that petitioner's "story of two lengthy imprisonments are not detailed enough as to her treatment or experience so as to be credible." However, the interviewer also reported:

> Assume the evidence is credible: Has applicant shown a significant possibility of qualifying as a refugee? Specify reasons.
> [ X ] Yes      [ ] No
> *If deemed credible, applicant experienced past persecution due to her imputed political opinion or membership in the Tamil ethnic minority.*

A hearing was held before Immigration Judge Esmeralda Cabrera on January 18, 1995. There were marked in evidence petitioner's application for political asylum and an advisory opinion of the Department of State's Bureau of Human Rights and Humanitarian Affairs. In addition, petitioner's attorney submitted an extensive package of documents from various sources describing conditions in Sri Lanka and the country's history of ethnic and political strife. The hearing was devoted principally to petitioner's testimony. The account which follows is derived from that testimony (with certain dates derived from her Asylum Request).

Petitioner, a Tamil who lived in the Jaffna area in Northern Sri Lanka, married in 1981. She became a housewife—her husband was a farmer who cultivated vegetables and a rice paddy. He owned land and acquired additional acreage with the dowry which petitioner brought to the marriage. Ultimately, his land was seized by the Sri Lankan Army.

In 1983, there occurred communal riots in which members of the Tamil minority were attacked by terrorist groups. After this development, petitioner's husband joined, the Liberation Tigers of Tamil Eelam (the "LTTE" or "Tamil Tigers"), a group seeking an independent Tamil state within the area of Sri Lanka in which the Tamil population predominated.

Petitioner's husband worked in the political section of the Tamil Tigers, canvassing for the group, writing in the newspapers and preparing newsletters. He asked people to attend meetings and contribute food.

At 5:30 in a morning in September 1988, elements of the Indian Peace Keeping Forces ("IPKF") and representatives of Eelam People's Revolutionary Liberation Front ("EPRLF") appeared at the home of petitioner's husband's parents, where petitioner and her husband were living. The EPRLF representatives informed the IPKF that petitioner and her husband supported and helped the Tamil Tigers. Both were arrested and taken to a detention camp.

In the camp, petitioner and her husband were separated. IPKF members interrogated petitioner about her husband's whereabouts, his comings and goings, his friendships and the whereabouts of the Tamil Tigers. The interrogators assaulted petitioner and used foul language toward her. This continued for four days in the room to which

she was originally taken. Afterwards she was taken to another room where the questioning and torture continued.

Petitioner's husband was subjected to the same treatment. Both were detained from September 1988 until May of 1989. In May one of petitioner's uncles spoke to the EPRLF and made a payment to the organization. The organization then interceded with the Indian Peace Keeping Forces, and petitioner and her husband were released. Both were warned not to help the Tamil Tigers or to do any type of work for them. Each promised not to assist the Tamil Tigers, and petitioner's husband ceased having any association with that group.

In March 1990, the IPKF left Sri Lanka and returned to India. For three months peace prevailed between the Tamil Tigers and Sri Lankan armed forces. In June 1990, fighting resumed. The Sri Lankan forces bombarded Jaffna, the city where petitioner and her husband and his family lived, from air, land and sea. In July 1991, petitioner's home and neighborhood were destroyed. The Sri Lankan forces could not determine who were members of the Tamil Tigers and, therefore, did "awful things to all the public and everybody."

After losing their home, petitioner and her family lived in bunkers and eventually found refuge in a church. They stayed there for about five months, then found another home which also was subjected to a bombardment.

Petitioner, her husband and petitioner's in-laws concluded that they could no longer remain in the Jaffna area, which is in the north of Sri Lanka where the Tamil people are in the majority. They decided to move south to Colombo, the capital of Sri Lanka. They arrived in November, 1992. Petitioner, her husband and her in-laws rented space in a lodge.

Three days after the family arrived in Colombo, six or seven Sri Lankan soldiers arrived at the lodge. They inspected petitioner's and her husband's identification cards, which disclosed that they were from Jaffna and were Tamils. The soldiers struck petitioner and her husband, accusing them of

being Tamil Tigers. Both were arrested and taken to a police station.

Interrogators took petitioner to a separate room, showed her photographs and asked if she recognized them. They attacked petitioner and burned her with cigarette butts. This continued for five or six hours.

Thereafter, petitioner was taken to a Sri Lankan Army detention camp. Water and food were inadequate, and petitioner was subjected to periodic torture. Asked to describe the torture, she testified:

> They tied my hands behind and they told me to put my neck under the table and they were hitting with something on my leg. They then removed my head from the table—from the table—removed the neck from the table and I was bleeding. Then I started crying then they put a plastic pipe filled with sand and they were hitting with that.

At no time was petitioner taken before a judge or allowed to see a lawyer. She was fingerprinted and photographed.

Petitioner remained in custody for a year and nine months. On August 1994, her father-in-law was able to bribe an Inspector to arrange petitioner's release. Petitioner described the event as follows:

Q. Can you explain the circumstances of your release?

A. One is—Inspector came in the night, he brought some clothes for me. He gave me the clothes and he told me to wear those clothes and come along with him. So I wore the clothes and went with him. He took me in a jeep alone and dropped me a place called Gold Fish near the sea and there, there was a taxi standing. He gave me hundred Tubus (phonetic sp.) in my hand and told the driver to take me to the lodge.

Q. What did you do after that?

A. So I went to the lodge—we got scared to stay in the lodge—we changed another lodge.

Q. Why were you scared, because you were released earlier, so why were you scared now?

A. This was related to this—it was bribed and I was released so we were scared and they had the fingerprints and my photographs in their file so we were scared they might come anytime and ask—

JUDGE TO MS. RATNAM

Q. Ma'am, when you say that you—we were scared—who is we?

A. My mother-in-law, my father-in-law and myself.

The next day petitioner's husband was released under similar circumstances.

Shortly afterwards petitioner's father-in-law learned from the manager of a lodge where they had previously lived that members of the armed forces were again looking for petitioner and her husband.

In response to the Immigration Judge's question why, if she were having problems in Colombo, petitioner did not move elsewhere in Sri Lanka, petitioner explained, "[i]n Sri Lanka all the other places they are owned by Sri Lankan Sinhalese Forces–Sri Lankan Sinhalese Police and all Sinhalese people are living in all the other areas." As for Jaffna, in the north, "there is also fighting is going on; in the mean time [if] we feel that we want to go to Jaffna, there are several barriers, army barriers out there so we can't cross those barriers and go to Jaffna."

In these circumstances, petitioner's father-in-law advised her and her husband to leave the country. The father-in-law made the necessary arrangements for their departure. Not long after their release from confinement petitioner and her husband proceeded to the airport with her in-laws. She was feeling ill, and her husband left the airport to obtain food for her. He never returned. Petitioner and her family heard shooting noises.

After three hours the time came for petitioner to board her plane. Her in-laws pushed her on and she departed without her husband. To this day she does not know what happened to him.

Petitioner testified that she fears to return to Sri Lanka: "I don't have any guarantee of my life and they have all the information about me; their photographs; their fingerprints. When I land there they'll arrest me and they will take me." When the Immigration Judge asked petitioner why she believed that she would be arrested or killed, petitioner replied, "I am Tamil and while they were talking they told all the Tamils are Tigers and all the Tamils has to be killed and if a child is born for you also that is also a Tiger. They will be also killed. And my information are there. Therefore, I am scared they will kill me."

After petitioner completed her testimony, the Immigration Judge took a brief recess and then returned to deliver her oral decision. It is apparent that she could not have reviewed the extensive assemblage of documents which petitioner's attorney offered into evidence at the commencement of the hearing—documents which provide an extensive background of the racial and political events of Sri Lanka and which required several days for me to review.

B. *Decision of the Immigration Judge:* The Immigration Judge noted at the outset of her opinion that petitioner conceded that she is excludable under § 212(a)(7)(B)(i)(II) (applicant not in possession of a valid unexpired nonimmigrant visa), § 212(a)(7)(B)(i)(I) (applicant not in possession of a valid unexpired travel document and not exempt from the presentation of the same), and § 212(a)(7)(i)(I) (an applicant appearing to be an immigrant not in possession of a valid unexpired immigrant visa and not exempt from the presentation of the same). The only issues for determination, therefore, were whether petitioner's request for asylum and for withholding of deportation to Sri Lanka pursuant to 8 C.F.R. § 208.1, *et seq.* should be granted.

The Immigration Judge set forth the principles of law applicable to asylum and withholding of deportation applications. She summarized petitioner's testimony accurately and in full detail. Further, the Immigration Judge found "... this applicant's testimony is credible. She testified in a straightforward and consistent manner. Throughout the course of the proceeding at times she's become visibly upset when discussing the events surrounding her detention in Sri Lan-

ka and the treatment she received during her detention." (Opinion at 11, 12).

Relying upon petitioner's testimony and in part upon the Department of State's Bureau of Human Rights and Humanitarian Affairs ("BHRHA") report, the Immigration Judge concluded that "applicant has presented insufficient objective facts to support an inference of past persecution or a risk to her of future persecution based upon her alleged political opinion or any imputed political opinion" and that "applicant has failed to establish a well-founded fear of persecution on account of her race, religion, nationality, membership in a particular social group, or political opinion...." (Opinion at 15).

The reasons which the Immigration Judge gave in support of these conclusions were:

1. "There's no evidence of any personal experiences or objective events which demonstrate that the applicant holds a political opinion which the government seeks to punish." (Opinion at p. 12).

2. For a period between her first and second periods of detention, petitioner was free to travel back and forth, and her in-laws have remained in Sri Lanka.

3. The BHRHA states that conditions in northern Sri Lanka constitute armed conflict between the government of Sri Lanka and the LTTE, in which both sides have inflicted casualties upon the other, and in which "both sides mistreat prisoners and arrest suspected opponents on an arbitrary basis." (Opinion at p. 13). "... Congress did not intend to confer eligibility for asylum on all persons who suffer from civil strife or civil disturbances. While the applicant's fear and desire to avoid the horrendous situation in Sri Lanka appear to be genuine, it is evident they do not stem from a fear of persecution but rather from a fear of the diversities (sic) of civil unrest and human rights abuses that are recurring in Sri Lanka." (Opinion at 15).

4. Although 18% of Sri Lanka's population is Tamil and 74% is Sinhalese, "[c]learly the profiles submitted by the Department of State does [sic] not support a conclusion that Tamil's [sic], because of their ethnicity, or their political opposition, are persecuted in Sri Lanka." (Opinion at 14).

The Immigration Judge determined that because petitioner failed to establish a well-founded fear of persecution on account of her race, religion, nationality, membership in a particular social group, or political opinion necessary to be eligible for asylum, it was unnecessary to consider whether she merited such relief as a matter of discretion. Further, the Immigration Judge ruled that because petitioner failed to establish eligibility for asylum, she had also failed to meet the higher standard of proof necessary for withholding deportation to Sri Lanka.

Pursuant to her opinion, the Immigration Judge ordered that petitioner's request for asylum under § 208 be denied, that petitioner's application for withholding of deportation to Sri Lanka under § 243(h) be denied and that petitioner be excluded and deported from the United States under § 212(a)(7)(B) of the Immigration and Naturalization Act.

C. *Opinion of Board of Immigration Appeals:* Petitioner appealed to the Board of Immigration Appeals ("BIA"). In an opinion dated April 13, 1995, the BIA dismissed the appeal.

In its opinion, the BIA summarized petitioner's account of her husband's membership in the LTTE, her two lengthy detentions, her and her husband's treatment while both were detained, and their flight to avoid further arrests or worse.

The opinion noted that petitioner had submitted extensive background material describing events and conditions in Sri Lanka over the course of the years of conflict there and further noted the BHRHA report. The BIA gave the following reasons for dismissing the appeal:

1. The applicant has not shown past persecution or a well-founded fear of persecution under section 208 of the Act, based on any of the enumerated grounds within the Act for which asylum may be granted. The applicant's first arrest and detention occurred not because of her own race, religion, nationality, membership in a particular social group, or political opinion, but because the IPKF sought information

about her husband, who was a member of the LTTE, and about his LTTE associates. The applicant's second arrest and detention occurred because she was suspected of being involved with the LTTE herself. Because her husband had been a member of the LTTE and both the applicant and her husband had been under investigation previously by the IPKF, this suspicion was not unfounded. (Opinion at 5).

2. Under the circumstances, the authorities had the legitimate right to investigate to determine the extent, if any, of the applicant's knowledge of and participation in terrorist activities. It has not been shown that the government's actions in this regard were based on political opinion or the applicant's status as a northern province Tamil. (Opinion at 5).

3. In addition, the applicant has not shown that the physical abuse she suffered at the hands of the Sri Lankan army and the IPKF amounted to persecution on account of any of the grounds enumerated in the Act, including that of the purported particular social groups of northern province Tamils and of her family. The historical context of the applicant's claim reflects that the Government of Sri Lanka does not persecute Tamils on account of their ethnicity or their political opinion, as there has been cooperation between the government and various major Tamil groups and a history of participation by Tamils in the government. (Opinion at 5).

4. The violence in Sri Lanka was begun by terrorist Tamil forces and continues because of those forces. *Id.* Although human rights violations do occur on a large scale in Sri Lanka, proof of human rights violations is not enough to establish persecution on account of one of the five grounds protected under the Act. *Id.* Thus, while there may be a "pattern or practice" of human rights abuses in Sri Lanka, those abuses have not been shown to constitute persecution for one of the five grounds specified in the Act. We note that the evidence reflects that government forces have dealt with Sinhalese terrorists as harshly as it has with the LTTE. (Opinion at 5).

5. In addition, the applicant has not established a well-founded fear of persecution on the basis of the violent situation in Sri Lanka which resulted in the destruction of two houses in which her family was living. Conditions of political upheaval which affect the populace as a whole are insufficient to establish an alien's eligibility for asylum. (Opinion at 6).

## II. *THE ADMINISTRATIVE RECORD*

Both the Immigration Judge and the BIA relied heavily, if not exclusively, upon the October 1994 Profile of Asylum Claims and Country Conditions submitted by the State Department's BHRHA. This superficial, six-page document presents an optimistic prognosis of conditions in Sri Lanka, based upon the results of the August 1994 Parliamentary elections. A new government, headed by Chandrika Kumaratunga, assumed office. The new government announced plans to form a Human Rights Commission and to investigate prior human rights violations.

The BHRHA report characterizes the situation in Sri Lanka as a civil war, pitting a Tamil faction against the government. Until 1990 the government was also involved in armed conflict with the Janatha Vimukthi Peramuna ("JVP"), a Sinhalese revolutionary group of Maoist leanings. It was suppressed in early 1990.

Several comments might be made about the BHRHA report.

First, it barely touches upon the long history of political, racial and human rights abuses inflicted by the Sri Lankan government and its agents during the decades which preceded the August 1994 election. These abuses preceded the armed conflict. The armed conflict which commenced in 1983 and has continued since that date was accompanied by continuing human rights abuses on both sides. Petitioner fled Sri Lanka about the time of the August elections. The abuses to which she and her husband were subjected commenced in 1988.

Second, there were periods in the past when the Sri Lankan government undertook to investigate the atrocities committed against Tamils and suspected political oppo-

nents. These investigations were half-hearted and only partially successful. It requires an act of supreme faith to be confident that the new administration can effect overnight change.[1]

Both the Immigration Judge and the BIA appropriately considered the BHRHA report. However, they each failed to recognize that on its face the report was extremely limited in its scope and they failed to take into account the comprehensive record in this case, a record which discloses the limited nature of the report and which places petitioner's testimony in proper perspective.

The record is derived from many sources. Some of the documents give every indication of being reliable and objective. Some are authored by partisans in the Sri Lankan struggle and must be viewed with caution. These documents include: numerous contemporary newspaper articles appearing in leading papers in England, India and the United States; January 1993 Report of Amnesty International; July 1992 report of the New York City- and Washington, D.C.-based Lawyers Committee for Human Rights (critiquing the 1990 State Department report on Sri Lanka); the U.S. Committee for Refugee report entitled "Sri Lanka Island of Refugees"; November 1992 report of the British Refugee Council; paper prepared for the Jesuit Refugee Service Asian Pacific; March 12, 1991 report of Asia Watch on Human Rights in Sri Lanka; February 1992 State Department report submitted to the Committee on Foreign Affairs, House of Representatives and Committee on Foreign Relations, U.S. Senate; September 1991 report of Amnesty International entitled "Human Rights Violations in a Context of Armed Conflict"; August 1992 Petition submitted by Global Organization of Indian Origin to the United Nations on behalf of Sri Lankan Tamils.

A review of the documents in their entirety discloses what transpired in Sri Lanka from the date of British withdrawal in 1948 until the present.[2] When the events of this extended period are juxtaposed against the 1988–1994 persecution of petitioner and her husband, the conclusion is inescapable that petitioner was arrested, tortured and confined because of her husband's suspected political activity and because she and her husband were Tamils from northern Sri Lan-

---

**1.** A May 21, 1995 article in the *New York Times* (obviously not a part of the record in the case) reflects the doubts about efforts to apprehend and punish the persons responsible for the atrocities.

> COLOMBO, Sri Lanka—For weeks, at hearings in town halls and school auditoriums across this island, bereaved families have been telling their grim stories: of groups of men, sometimes women and teenage children, being rounded up by armed men at intervals in the last decade and driven away, never to be seen again.
>
> Since ethnic and political tensions exploded in the 1980's, life for many Sri Lankans has been a grim parody of the tropical paradise described by early Western travelers to what was then Ceylon. For more than a decade, this country of 18 million people fell prey to a culture of violence that made Government death squads, mass graves and killings of ethnic Tamils and Sinhalese part of everyday life.
>
> Last fall a new Government took office promising to end the nightmare. Under President Chandrika Bandaranaike Kumaratunga, widowed in a political killing in 1988, the new administration pledged to return the country to the rule of law and investigate all past abuses, whether committed by the previous Government or by militant groups that used terror against it.
>
> "We will dig up every grave," Mrs. Kumaratunga said.
>
> The promise of an accounting for past abuses was coupled with a pledge by the new Government to seek a negotiated end to Sri Lanka's long-running war with Tamil Tiger separatists, which spawned many of the brutalities. But events in recent weeks have raised doubts about the Government's ability to deliver effectively on the promises, and worse still from the standpoint of many Sri Lankans, raised the possibility that the brutalities could recur.
>
> \* \* \* \* \* \*
>
> Because many of those accused in the disappearances are army and police officers who now hold key positions in the war against the Tamil Tigers, Sri Lankans have been caught in a debate over how far the investigating should go.

**2.** An October 1991 report entitled "Sri Lanka: Island of Refugees issued by the U.S. Committee for Refugees" (Exh. 44) is drawn upon extensively in this opinion for the history of events from 1948–1983. All the data set forth in that report referred to in this opinion is corroborated by other material appearing in the record.

ka. As will be discussed more fully below, this conclusion, derived from the totality of the documents, finds full support in the State Department's own comprehensive 1992 Report to the House of Representatives and Senate Foreign Relations Committees—a report which is in marked contrast to the sketchy BHRHA report upon which the Immigration Judge and the BIA evidently relied.

To understand the nature of the governmental actions taken against petitioner and her husband, it is necessary to review briefly the roots of the controversy between the Sinhalese and Tamil elements of the population. Many religious and ethnic groups inhabit Sri Lanka. The predominantly Hindu Tamils comprise approximately 17.7% of the population. The predominantly Buddhist Sinhalese account for more than 70% of the population. There are large concentrations of Tamils in the north and northeast portion of the country.

Under British rule, the Tamils prospered, filling important positions in government and in a thriving economy. In 1948 Sri Lanka, then known as Ceylon, received independence from Britain. Shortly afterwards the Sinhalese majority undertook the first of a series of moves to reduce the power and influence of the Tamil population.

In the nineteenth century, the British brought to Ceylon many thousands of Indian Tamils to work in the coffee and tea plantations. By 1948, the Tamils of Indian origin (the "Plantation Tamils") numbered 800,000. In 1948 the Sinhalese majority in parliament enacted legislation depriving the vast majority of the Plantation Tamils of citizenship. In 1949 legislation restricted the right to vote to citizens. As a result, the Tamil voting power in the legislature declined markedly and the Sinhalese acquired total control.

More militant Tamils formed the Federal Party. In 1956 the militant Sri Lanka Freedom Party ("SLFP") won the election urging Sinhalese Buddhist nationalism. After independence both Sinhala and Tamil were accepted as the language of administration. After the Sri Lanka Freedom Party victory, however, Parliament passed the Official Language Act, which declared Sinhala to be the national language of Sri Lanka and the official language of government.

The Federal Party and other Tamil groups mounted rallies and demonstrations against the Act. Sinhalese mobs attacked demonstrators, and the nation was threatened with widespread disorder.

In July 1957, SFLP's leader, S.W.R.D. Bandaranaike and S.J.V. Chelvanayakam, leader of the Federal Party, negotiated a pact which recognized Tamil as a national language and which provided for limited local control in the northern and eastern provinces where Tamils were concentrated. Prime Minister Bandaranaike did not agree to restore citizenship to Tamils of Indian descent nor would he agree to the establishment of a semi-autonomous Tamil linguistic state within a federal union.

In April 1958, Prime Minister Bandaranaike abrogated the pact he had negotiated with Chelvanayakam. In May the Federal Party of Tamils convened to organize non-violent protest. Sinhalese extremists fomented mob violence which resulted in massacres, looting, assault and arson against the Tamils, especially in Colombo, the capital. Hundreds of Tamils were killed by the Sinhalese and between 12,000 and 25,000 were driven from their houses. Thereafter new, repressive measures were enacted against the Tamils and the Federal Party was banned.

In 1964, Sri Lanka and India entered into an agreement whereby the two countries agreed to divide the Plantation Tamils on a 4:7 ratio. India was to grant citizenship to seven people for every four granted citizenship by Sri Lanka. When it came time to implement the agreement in 1968, 700,000 Plantation Tamils applied to remain in Sri Lanka and only 400,000 chose to receive Indian citizenship. Sri Lanka accepted only 225,000 under the previously-agreed upon ratio, and the remainder of the 700,000 Plantation Tamils remained stateless.

In March 1965 the more moderate Sinhalese United National Party ("UNP") defeated the SLFP, and the Tamils' Federal Party and representatives of the Plantation Tamils participated in a coalition govern-

ment. However, in 1970 Bandaranaike's SLFP enjoyed a two-thirds majority in Parliament through a coalition with the Marxist parties.

Superimposed upon the Sinhalese–Tamil ethnic strife was the April 1971 insurrection of the Maoist Sinhalese youth movement, the Janatha Vimukthi Peramuna ("JVP") or People's Liberation Front. It took the government two weeks of heavy fighting to suppress the revolt, during which between 1,200 and 8,000 people were killed and 16,000 imprisoned. Thereafter, the JVP continued an armed struggle against the government which was not fully suppressed until 1990.

Having won control of Parliament in 1970, SLFP resumed its drive to secure total Sinhalese dominance in the nation. In 1971, the university entrance requirements were changed. The minimum grade average was raised for Tamil students, and students from predominantly Sinhalese areas were to receive preference for acceptance. In May 1972 SLFP secured adoption of a new constitution which changed the name of the country from the Dominion of Ceylon to the Republic of Sri Lanka. It established a unicameral legislature with new powers over the judiciary. The constitution designated Sinhalese as the only official language and gave Buddhism "foremost place," stating that "it shall be the duty of the state to protect and foster Buddhism."

It was apparent to the largely Hindu Tamils that accommodation and power sharing was at an end. In response to the developing situation, a coalition of Tamil political parties formed the Tamil United Liberation Front ("TULF"), calling for an independent, secular Tamil state. Thus, in 1976 there commenced a brief period of nonviolent efforts for a separate state. The Ceylon Workers' Congress, representing the Plantation Tamils, sought equal rights for Tamils but did not seek Tamil sovereignty.

In 1977 the SLFP was once again defeated by the United National Party ("UNP"), and there was hope that an accommodation could be reached with TULF. However, in September 1977, racial passions overwhelmed the nation as Sinhalese mobs attacked and looted Tamil homes and shops, killing approximately 300 persons and displacing 35,-000 Tamils. The Plantation Tamils, who had opposed separation, were not spared.

The UNP continued to negotiate with TULF through its leaders and representatives in Parliament. However, progress was slow and uneven, and the initiative passed to a younger generation of Tamils who gave up on nonviolent means and turned to terror and violence—terror and violence directed not only against the Sinhalese majority, but also against Tamils who disagreed with the course of armed insurrection.

Leader of the new movement was Velupillai Prabhakaran, then an 18–year–old ex-student, and still leader of the Tamil Tigers' insurrection. In 1972 Prabhakaran assumed control of a small youth group. In 1975 his group claimed credit for the assassination of the pro-government mayor of Jaffna. In 1976, as TULF called for a separate, secular Tamil state, the militant group assumed the name Liberation Tigers of Tamil Eelam ("LTTE"). The Tamil Tigers escalated their attacks upon policemen, public officials and Tamils who opposed their movement.

The UNP continued to negotiate with TULF but starting in 1981 the efforts at accommodation were overwhelmed by massive communal violence against the Tamil populace, violence sparked by the assassination of a leading UNP candidate and the killing of two policemen at a TULF rally. As described in one account, "[a]mong the more ominous new manifestations of the 1981 riots was the activity of organized, politically directed thugs, and the passivity of the police and armed forces in preventing Sinhalese mob attacks." (Exh. 44 at 8).

Nineteen Eighty–One was the year in which petitioner and her husband were married. They lived near Jaffna, the heart of the Tamil area, where the husband worked on his farm.

In 1983, there occurred anti-Tamil riots which completed the polarization of the two ethnic communities. Violence against Tamils took place throughout Sinhalese dominated areas. Estimates of deaths ranged from 350 to more than 2,000. More than 18,000 Tamil homes and 5,000 businesses were destroyed.

Nearly 100,000 refugees entered centers for displaced persons near Colombo. Thousands more, including 35,000 Plantation Tamils, fled north and Tamils started fleeing the country.

Police and military elements joined the mob violence. Responding to an inflamed Sinhalese populace Sri Lanka's president moved away from compromise. In August 1983 the Constitution was amended making it illegal to advocate separation. Refusing to undertake to abide by that position, TULF's members of Parliament were expelled. Increasingly thereafter, each side resorted to violence to pursue its aims.

The government curbed important legal safeguards, permitting detention without charge or trial for up to eighteen months for all Tamils. It was at this juncture that petitioner's husband joined the Tamil Tigers. As was noted above, he did not engage in violent activities. Rather, he worked in the political section, canvassing for the group, writing in newspapers and preparing newsletters. He asked people to attend meetings and contribute food.

After 1983, arrests, detentions, killings and disappearances of Tamils escalated, much of it conducted by police and military forces.

India had a particular interest in Sri Lanka which lies off its southeastern coast. The Tamils of Tamil Nadu state of South India feel a strong solidarity with the Tamils of Sri Lanka. It is a short distance across the Palk Strait from the Jaffna Peninsula to Tamil Nadu, and the Strait became a supply route for the Tamil Tigers.

In 1987 India sent troops to Sri Lanka to serve as a peacekeeping force, the IPKF. The IPKF joined in the struggle against the Tamil Tigers.

It will be recalled that in September 1988 elements of the IPKF along with representatives of the EPRLF appeared at the home of petitioner's husband's parents, arresting both petitioner and her husband and taking them to a detention camp. There they suffered the abuses previously described and there they remained until May of 1989. They were warned not to assist the Tamil Tigers in any way, an injunction which they carefully obeyed.

In 1990 the IPKL left Sri Lanka. This was the same year in which the Maoist JVP was suppressed. However, after a brief period of relative calm, the Tamil Tiger insurgency broke out anew with extensive guerrilla and military operations taking place largely in northern and eastern Sri Lanka, where there were heavy concentrations of Tamils.

It was during these operations in 1991 that petitioner's home was destroyed in a bombing by government forces. After moving from place to place during 1991 and 1992, petitioner and her in-laws moved south to the Colombo area.

This was a period of both official and vigilante persecution of Tamils, particularly those suspected of sympathy for the Tamil Tigers. The nature of this persecution can be suggested by excerpts from the reports of outside observers which are included in the record in this case.

*Report of Investigative Mission*
Into Alleged Violation of Human
Rights in Sri Lanka

November 1990

(Exhibit 58)

Disappearances and extra-judicial executions have been reported with increasing frequency since mid–1983. In addition, in the late 70s opposition groups engaged in armed struggle to establish a separate Tamil State. From July 1987, armed opposition escalated in the Sinhala majority areas of southern Sri Lanka and were particularly numerous towards the latter half of 1989.

In addition, the Prevention of Terrorism Act and Emergency Powers Regulations gives power to police and armed forces to arrest and detain suspects without any democratic accountability.

*Findings*

Reports were received of people who have been taken and their bodies later discovered often burned and mutilated. Other people were taken into custody and disappeared after release from custody. In many cases, people have disappeared without any trace. Families seeking information about their rel-

atives from the police station receive no information and are still waiting to hear.

Various estimates we have received, suggest that at least 60000 people disappeared in the South of Sri Lanka since 1987. This represents about one in every 250 of the population. This excludes the North and East of Sri Lanka. During our stay, we received reports of continuing disappearances, for example between 20 and 50 per week in the Kandy area since 1990.

A large number of reports were received alleging direct or indirect involvement of the police and armed forces. Sometimes, it appeared that vigilante forces operating on behalf of armed forces and police took away relatives at night. Sometimes police in uniform, or police in plain clothes, but known to be police took away relatives. The Prevention of Terrorism Act and Emergency Powers Regulations appear to be abused.

*Conclusions*

1) Although the army and authorities deny responsibility for the killings and disappearances, the scale is such that the State cannot be absolved from responsibility. The State has either failed in its duty to maintain law and order or has condoned the activities of the security forces.

2) The Government claims that the JVP problem was resolved in December 1989. It claims that any problems of violence are now restricted to the North and East of Sri Lanka. According to the Government, the situation is normalized in the South but it is apparent that many killings and disappearances continue.

\*       \*       \*

*News from Asia Watch*
Human Rights in Sri Lanka: An Update

(March 12, 1991 (Exhibit 49))

As the killing of Deputy Defense Minister Ranjan Wijeratne on March 2, 1991 underscores, the Sri Lankan human rights situation is marked by lawlessness on all sides. Wijeratne, who ran an often brutal government campaign against Tamil separatists, was killed together with 18 others in a car bomb explosion in Sri Lanka's capital, Colombo. It was not immediately clear which

of the several parties with grievances against the minister was responsible.

Those parties include militant groups such as the Janatha Vimukthi Peramuna (JVP), a radical Sinhalese nationalist insurgency operating in the south of the country, and the Liberation Tigers of Tamil Eelam (LTTE, also known as the Tamil Tigers), the largest of numerous armed Tamil guerrilla groups fighting for an independent state in the northeast. All have committed atrocities in the course of the civil war. The government, for its part, has directly contributed to the violence of supporting, training and arming groups with a history of abuses against civilians, sometimes supporting two or more rival factions against each other, sometimes encouraging the formation of death squads composed of members of the security forces. It has engaged in a series of purges of suspected sympathizers of the various guerrilla groups, involving mass arrests, disappearances and extrajudicial executions.

\*       \*       \*

If the LTTE initiated this latest round of fighting, the security forces have been equally responsible for abuses. Some civilian deaths have been attributed directly to the army and police; others have been linked to vigilante groups. Since June 1990 there have been numerous reports of arrests, torture and killings of young Tamil men by the security forces. Tamil refugees who have fled Sri Lanka have told foreign journalists wrenching stories of the torture and horrible mutilation of young family members by Sri Lanka soldiers. Reports of disappearances, necklacing (burning live victims in tires) as well as tires being used to burn corpses are numerous. Many homes and businesses have also been destroyed by fire. Amnesty International reported in September 1990 that since the Sri Lankan army regained control of Batticaloa in June, they estimated that over 400 people had disappeared from that district alone, following detention by security forces. Although some may have been released, many are feared dead. In Batticaloa, "Piles of burnt bodies have appeared in various places overnight, when only

the security forces are likely to be out on the roads."

\* \* \*

Mass arrests of young men are by no means restricted to the northern part of Sri Lanka and the justification given for recent sweeps in the South are familiarly vague. On October 10, according police in Colombo reportedly rounded up and arrested about 200 Tamil youths because they arrived in Colombo from the Northeast "with ulterior motives." Observers report that many of the hundreds of young Tamil men detained in Colombo since June are still missing.

Southern universities, still recovering from the disappearance of thousands [of] their Sinhalese students during the purges of suspected JVP sympathizers last year, are now losing Tamil students as well. Young men have disappeared in large numbers from universities throughout the country. On July 16, according to local observers, a Tamil language paper reported seven engineering students from Jaffna who were travelling by bus to the University of Peradeniya to take exams disappeared following their arrest at the Dumbulla police checkpoint. The Chancellor of the University was informed of the arrest the next day, although Dumbulla police now deny the incident. Another student who remained unobserved on the bus reported that he saw the students taken by the army. 50 other engineering students who travelled by train to Peradeniya the same day were assaulted by police. Two assistant lecturers in engineering also from Peradeniya University, both Batticaloa Tamils, were also reported missing in late June.

\* \* \*

Reports indicate that government and the LTTE are guilty of similar large-scale abductions of Tamil civilians in the Northeast. According to the U.S. State Department,

"Credible reports indicate that the security forces rounded up large groups of Tamils and that many suspects were summarily executed. In one case, credible sources report that over 100 Tamils disappeared after being taken from a refugee camp in the east in early September...."

On September 10, according to a spokesman for the ENDLF (Eelam National Democratic Front), the LTTE abducted 200 Tamil youths from a boys camp near Batticaloa and killed many of them. A military official from Batticaloa confirmed the disappearances but could not confirm the killings.

*Amnesty International*
Sri Lanka—The Northeast Human Rights Violations in A Context of Armed Conflict

September 1991 (Exhibit 51)

6.2 "Disappearances" and extrajudicial executions

Over 3,000 Tamil people are reported to have "disappeared" in the custody of government forces in the east since June 1990. That such serious abuses have continued well into 1991 is confirmed, however, by recent reports in the Sri Lankan and the international press as well as from other sources. The number of "disappearances" and extrajudicial executions reported since the beginning of 1991 amounts to several hundred.

"Disappearances" and extrajudicial executions have been reported in large number from several districts in the east since government forces moved in. By October 1990, some 3,000 Tamil people were estimated to have been killed or to have "disappeared" in Amparai District alone during the previous four months. Many of these people were believed to have been victims of extrajudicial executions and "disappearances" in Vavuniya, Mannar and Kayts.

Victims of extrajudicial execution have reportedly been shot, bayonetted, stabbed, hacked or beaten to death. Some were said by witnesses to have been burnt alive. Many people were apparently detained or killed because they had contact with the members of the LTTE, sometimes of the most minimal kind during the period the LTTE controlled the area.

Reports indicate that members of the regular security forces—the army, the police and the Special Task Force (STF)—were responsible for many of the reported extrajudicial executions and "disappearances." Oth-

ers were reportedly perpetrated by home guards who launched retaliatory attacks on Tamil civilians, with the apparent acquiescence of the security forces, following attacks committed by the LTTE.

In spite of the many of "disappearances" and deliberate killings committed by government forces, Amnesty International is also aware of some instances in which individual officers have intervened to save the life of a person who was likely to be killed. One example is given above (see page 16).

Those who have "disappeared" have been detained in a variety of circumstances. Many have "disappeared" following round-ups of large numbers of people for screening as potential LTTE suspects. During such operations, people are often screened by local Muslims co-operating with the security forces or by members of Tamil groups opposed to the LTTE, which also co-operate with the security forces. The round-up of potential suspects has been reported from refugee camps as well as from villages. Young Tamil men are particularly likely to be rounded up, but the names of old men, women and young children also appear on lists of those who have "disappeared" after being arbitrarily detained. These people could not all have reasonably been considered terrorist suspects: the list of "disappeared" people from one round-up in Batticaloa district, for example, includes babies only months old together with their mothers (see below, page 24).

\*    \*    \*

Human rights abuses are also committed on a large scale by the main armed group opposed to the Sri Lanka government, the LTTE, which effectively controls large areas of the northeastern province. The LTTE has long held and administered nearly the whole of the Jaffna peninsula. After the gradual withdrawal of the IPKF in the period late 1989—March 1990, the LTTE took control of the areas they had vacated.

*Department of State*

Report Submitted to the Committee on Foreign Affairs, House of Representatives and Committee on Foreign Relations, U.S. Senate February, 1992 (Exhibit 50)

\*    \*    \*

There continued to be major human rights abuses in 1991, but the number of incidents was markedly reduced from 1990. For example, extrajudicial and combat-related civilian deaths declined from 2,600 in 1990 to 710 in 1991, according to government statistics, the press, and nongovernmental observers. There were also hundreds of disappearances, most credibly linked to security forces; torture and mistreatment of prisoners; arbitrary arrest and detention, including incommunicado detention; and restrictions on freedoms of speech, press, assembly, and association. Both government and insurgent elements were guilty of abuses. The Prevention of Terrorism Act (PTA) and Emergency Regulations (ER), both of which grant security forces wide powers such as preventive and incommunicado detention, remained in effect. Some provisions were suspended temporarily outside the northeast, however, to permit unhindered elections.

### SRI LANKA

The Government established one commission to investigate disappearances occurring after January 11, 1991, and another to register and monitor detainees. The work of the first commission, however, has proceeded very slowly, and neither's mandate includes pursuit of prosecutions. Despite widescale human rights abuses in recent years, the Government has indicted a limited number of offenders, and only a few cases had been concluded by the end of 1991.

\*    \*    \*

a. Political and Other Extrajudicial Killing

Political killing by the Government's security forces, the LTTE and other militant groups, and vigilantes continued on a reduced but still large scale. According to government statistics, the press, and nongovernmental observers, there were roughly 710 noncombatant deaths caused by both government and antigovernment forces in 1991, compared to 2,600 for 1990. Of the 710, more than 650 occurred in the war-torn northeast and bordering areas.

\*    \*    \*

In the past, when such killings were far more common, strong circumstantial evidence and the opinion of a wide range of observers, including some members of the security forces themselves, linked individual security force members to some vigilante groups. It is likely that vigilantes operated with the knowledge and acquiescence of government officials. In 1991 government sources claim these extrajudicial killings in the south were frequently due to the private settling of scores, especially against JVP members and supporters, rather than continued officially condoned vigilante group actions. Charges have been brought against security force members in at least two vigilante cases, and legal proceedings initiated in eight other human rights-related murder cases. These cases date from 1988 to 1991. Only one of the cases had been resolved by the end of 1991 (see Section 1.c.), owing partly to killings and intimidation of witnesses and partly to a large backlog in the judicial system and the fact that such cases are not given special priority. Those responsible for killing and intimidating witnesses in such cases are almost never brought to justice.

\* \* \*

b. Disappearances

Disappearances of both Tamils and Sinhalese, usually young men, continued in 1991 on a very large scale, though reduced from levels over the past 5 years, during which time it is estimated that as many as 10,000 persons disappeared. Although exact numbers are not known, knowledgeable sources estimate that 114 persons disappeared in the south (18 in the last 5 months) and approximately 785 in the northeast (90 in the last 5 months), although one knowledgeable source believes there may have been as many as 1,000 disappearances in one of three eastern districts alone. Disappearances in the south were attributed to security forces, vigilantes who may be tied to security forces, and insurgent elements, but the degree of responsibility for each group was not clear. In the northeast, government forces were judged responsible for the majority of 785 disappearances in 1991. An additional 300 persons believed captured by the LTTE in 1991 also remained unaccounted for. There were reports of the LTTE abducting persons in the northeast and holding them for ransom. In a few cases, families have testified that JVP detainees known to have been released never returned home, presumably because they were killed by unknown persons or forces after their release.

\* \* \*

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the Constitution forbids torture and cruel, inhuman, or degrading treatment or punishment, the Emergency Regulations allow the use in court of confessions made to police officers and place the burden of proof on defendants to show that a confession was extracted under duress. Beatings are routinely given during interrogations throughout the country, and especially brutal beatings, in which bones were broken, were reported in police stations in the south and east. Some government security officials acknowledge that security forces have used torture to elicit information and cooperation from suspected members of the JVP and LTTE. Victims and family members have also alleged torture by Tamil militant groups.

*Lawyers Committee for Human Rights*

Critique—Review of the U.S. Department of State's Country Reports on Human Rights Procedures for 1991

July 1992 (Exhibit 42)

\* \* \*

SRI LANKA

This year's State Department report contains many incisive observations on the disturbing human rights situation in Sri Lanka. While the report correctly points out that the number of human rights violations reported was markedly reduced from 1990, it recognizes that the violations committed by the government and by the separatist Liberation Tigers of Tamil Eelam (LTTE) were still massive. Thus, the report notes that political killing continued on a "reduced but still large scale"; that "disappearances" also continued "on a very large scale"; that "[b]eatings are routinely given during interroga-

tions"; and that the civil war resulted in "indiscriminate killings on a large scale."

The report nevertheless contains many shortcomings. While the section on extrajudicial killings contains numerous informative examples, corresponding information in the sections on disappearances and torture are relatively weak. It ignores the human rights issues raised in the attempted impeachment of President Premadasa, the most important political event of the year. The section on freedom of the press omits some important incidents. In relating examples of human rights violations stemming from the insurgency, the report in some instances downplays the involvement of the security forces. Lastly, the report fails to address the efficacy of the various commissions established by the government to monitor or investigate alleged human rights violations.

*       *       *

In several instances, the report leaves out crucial facts in the examples it describes that would provide useful insights into the behavior of the Sri Lankan security forces. The report cites an incident in which a bus was attacked and six Tamil civilians were killed in the northeast in February, and notes that responsibility lies either with a Muslim mob seeking revenge for an LTTE attack on Muslims or with the Muslim Home Guards, a paramilitary vigilante group armed by the government. The report fails to note significant facts reported by Amnesty International: the bus was part of a convoy that had a military escort through part of the eastern province until it reached a Muslim Home Guard "checkpoint," at which the military escort turned back, leaving the convoy unprotected. The convoy was attacked soon after, reportedly by persons in uniform, suggesting the Home Guards. Moreover, the military failed to intervene, although the incident occurred within earshot of an army camp. Despite the apparent military complicity, Amnesty International reports that it knows of no government inquiry into the incident.

*       *       *

The report notes that the government has established three commissions to look into human rights issues: the Officials' Committee on Human Rights, established in November 1990 to review and make recommendations with regard to human rights cases referred to it, primarily from international sources; the Human Rights Task Force, set up in August 1991 to monitor the treatment of detainees; and the Presidential Commission of Inquiry into Involuntary Removal of Persons (the Disappearance Commission), established to inquire into disappearances after January 11, 1991 (the date the regulation establishing the Commission was promulgated). Beyond stating that "human rights activists claim [that the commissions] are mostly cosmetic," the report provides little analysis of their efficacy. The Officials' Committee on Human Rights, for instance, appears designed to allay the concerns of major donor countries, rather than improve the human rights situation in Sri Lanka. And while noting that the Disappearance Commission refused to broaden its investigatory mandate to disappearances prior to January 11, 1991, the report fails to point out that this temporal demarcation excludes tens of thousands of "disappearances" occurring between 1987 and 1991. In fact the Disappearance Commission rejected 535 of the 601 complaints it received through August 5, 1991 (the date the Commission began hearings), because they had occurred prior to January 11, 1991. It is reported that the Disappearance Commission has now refused over 2,000 cases from before 1991. The report also should have noted that claims must be filed with the commission in person in Colombo, on the country's western coast, which for safety and financial reasons is often prohibitive for persons living in the north and east, where the vast majority of "disappearances" since January 1991 have occurred.

*Amnesty International*

Sri Lanka: An Assessment of the
Human Rights Situation

January 1993 (Exhibit 17)

An Amnesty International delegation visited Sri Lanka in October 1992. It assessed the government's implementation of the recommendations Amnesty International had made a year earlier on human rights safe-

guards and evaluated the current human rights situation in both the northeast and the south. This report summarizes their findings.

Following a research visit by Amnesty International in June 1991 and the publication in September 1991 of *Sri Lanka—The Northeast: Human rights violations in a context of armed conflict,* the Government of Sri Lanka announced its acceptance of 30 or the 32 recommendations for human rights safeguards made by the organization in that report. In February 1992, the government invited Amnesty International to return to Sri Lanka to assess the implementation of these safeguards.

\* \* \*

Since mid–1991, the Government of Sri Lanka has displayed much greater openness to scrutiny by international human rights organizations. This is a welcome development which Amnesty International hopes will contribute to the strengthening of human rights violation, and most of Amnesty International's recommendations concerning these new bodies have been implemented. However, many other recommendations which the government also accepted have not yet been implemented. These include the establishment of primary procedural safeguards to be followed by the security forces to prevent persons taken into custody from "disappearing" or being tortured. For example, the army was not issuing certificates of arrest after cordon and search operations and admitted that it holds certain prisoners in secret detention hidden from the International Committee of the Red Cross (ICRC). Amnesty International learned of prisoners who had been held secretly for up to a year. In the south, abductions by plainclothed military and police personnel were reported in 1992. Other aspects of arrest and detention procedures covered by the recommendations and accepted by the government would require for their implementation the amendment or withdrawal of emergency legal provisions, and this has not been done.

\* \* \*

Compared to the previous year, Amnesty International found that significantly fewer "disappearances" and extra judicial executions were being committed by the security forces. Nevertheless, these grave violations of human rights continued in the east, particularly, at a rate which remains high, with scores of "disappearances" reported during 1992. Amnesty International was also disturbed to find that prisoners continued to be tortured and ill-treated in both military and police custody, and believes that the authorities need to take decisive action to curb these practices. In addition, the organization is concerned that several thousand people remain in untried, administrative detention for long periods, some for over three years. To date, there does not appear to be an agreed policy on processing these cases; the various state agencies involved may reach different, inconsistent administrative decisions on individual cases because they work separately from each other and appear to base their decisions on different bodies of evidence. In such a situation, prisoners cannot know where they stand and fear that even if released after spending a period in rehabilitation, which they had understood would lead to unconditional release, they may be arrested again and charged with the original offense. Those not recommended for rehabilitation remain in indefinite detention. No clear decision appears to have been made about their fate.

The events which overtook petitioner and her husband occurred in the context of the conditions described above. It will be recalled that they had been released from their original detention in May 1989. They then suffered from the ravages of the government-LTTE warfare in the Jaffna Peninsula and in 1992 moved south to the Colombo area.

Although pressure from international agencies produced a reduction in the number of disappearances, extrajudicial executions and unlawful detentions, such occurrences were still prevalent. In areas controlled by the Tamil Tigers, these acts were directed at their opponents, whether Sinhalese or Tamil. In the rest of the country, these acts were directed at Tamils, particularly northern Tamils like petitioner and her husband who once had links to the Tamil Tigers.

Thus, in November 1992, three days after petitioner, her husband and her in-laws arrived in Colombo, petitioner and her husband were arrested by Sri Lankan soldiers, questioned and tortured and ultimately sent to a detention center where they suffered periodic torture. They were held in the detention center for a year and nine months without judicial proceedings. They were released only after petitioner's father-in-law bribed an inspector.

There was no assurance that the couple would not be arrested again. As stated in the January 1993 Amnesty International Report: "[If released] prisoners cannot know where they stand and fear that even if released after spending a period in rehabilitation, which they had understood would lead to unconditional release, they may be arrested again and charged with the original offense. Those not recommended for rehabilitation remain in indefinite detention. No clear decision appears to have been made about their fate." (Exhibit 17).

Faced with the likelihood of rearrest and detention, petitioner and her husband decided to flee the country. In the light of recent history, her husband's disappearance at the airport and the continuing absence of any knowledge of his whereabouts is ominous.

The foregoing is a summary of the contents of the administrative record—a record which both the Immigration Judge and the BIA appear to have ignored, a record which renders untenable critical factual findings forming the basis of their decisions.

### III. Discussion

Petitioner seeks review of the BIA's decision denying her withholding of deportation and asylum.

■ To obtain a withholding of deportation, a person must show that there is a clear probability, or that it is more likely than not, if returned to her home country, her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group or political opinion. 8 U.S.C. § 1253(h); *INS v. Stevic*, 467 U.S. 407, 429–30, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984). If a person establishes eligibility, withholding of deportation must be granted.

■ To obtain asylum, a person must show that she has a well-founded fear of persecution on account of at least one of those same five factors. 8 U.S.C. § 1158(a), 8 U.S.C. § 1101(a)(42)(A). A "well-founded" fear is a fear that is both genuine and objectively reasonable. To be objectively reasonable, there must be some reasonable possibility of persecution on one of the five statutorily-impermissible bases, but persecution does not have to be more likely than not. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987). Once the applicant for asylum establishes her entitlement to it, relief is not mandated but may be granted as a matter of discretion.

■ The BIA's opinion stated the applicable law correctly. Its factual findings are reviewed under a substantial evidence standard and may be reversed only if the evidence presented is so compelling that no reasonable factfinder could fail to find the requisite fear of persecution. *INS v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The BIA's determinations fail even under this deferential standard.

The BIA found that: (i) petitioner has not shown past prosecution or a well-founded fear of prosecution based on political opinion or the petitioner's status as a northern province Tamil; (ii) the arrests, detention (and presumably the torture) of petitioner constituted the authorities' "legitimate right to investigate to determine the extent, if any, of the applicant's knowledge and participation in terrorist activities"; (iii) "the Government of Sri Lanka does not persecute Tamils on account of their ethnicity or their political opinion" and (iv) "the violence in Sri Lanka was begun by terrorist Tamil forces and continues because of those forces."

In light of the record in this case, including the State Department's comprehensive Report to Congress' foreign affairs committees, these conclusions are unsupported and, in fact, are patently wrong.

Starting with the last finding, that "[t]he violence in Sri Lanka was begun by terrorist Tamil forces and continues because of these

forces," nothing could be further from the truth.

It is true that the LTTE, an extremist Tamil faction has become an armed insurrection against the Sri Lankan government, that it perpetrates acts of terror in Sinhalese dominated areas and that it commits atrocities against its opponents in Tamil areas where it has a strong presence. Violence, however, did not originate with Tamil terrorists. As recorded in the summary of the administrative record set forth above, the terrorists themselves were the product of decades of Sinhalese majority efforts to reduce the Tamils to a state of second class citizenship (or no citizenship at all). The armed rebellion burst forth after massive Sinhalese attacks on Tamil citizens, homes and businesses, killing thousands and displacing tens of thousands of Tamils.

Since 1983 the government has through military means sought to suppress the Tamil Tigers. In recent months, a newly-elected president offered the Tamil Tigers a truce and an opportunity to negotiate. Under the domination of the fanatical Vellupillai Prabhakaran, the Tamil Tigers rejected this offer and armed conflict continues.

■ The BIA, however, totally ignores the undisputed record when it finds that this is the violence in Sri Lanka which petitioner fears and seeks to avoid. What the BIA failed to note is the other form of violence which has afflicted Sri Lanka and which proceeded along with the violence of armed conflict. The kind of violence to which petitioner and her husband were subjected was the anti-Tamil persecutions which were not a part of any military operation and, in fact, occurred frequently in areas where there was no armed conflict. This was the violence of the Sinhalese against Tamils perpetrated by members of the armed forces and security personnel and by vigilante groups often acting with the knowledge or assistance of government agencies. In no sense can it be stated, as the BIA stated, that this kind of "violence in Sri Lanka was begun by terrorist Tamil forces and continues because of those forces."

Equally unsupportable is the BIA finding that what the authorities did to petitioner and her husband was their "legitimate right" to investigate to determine the extent, if any, of the applicant's knowledge and participation in terrorist activities.

Both arrests and detentions of petitioner and her husband must be viewed in the light of anti-Tamil persecution which was described above.

The original detention (and questioning) of petitioner and her husband in September 1988 might be rationalized on investigative grounds because the husband had been a member of the Tamil Tigers. The questioning and even the torture might be considered part of an investigative process.

But when the questioning and the torture produced no evidence to support charges against either of them and when they were pumped dry of information, continued detention until a bribe procured their release was no longer part of an investigative operation. It became eight months of confinement because they were Tamils, one of whom had once engaged in nonviolent activities in support of the Tamil Tigers.

It is impossible to characterize the second arrest and detention as investigative in purpose. In November 1992, the destruction inflicted by the government's military operation on the Jaffna Peninsula induced petitioner, her husband and his parents to flee south to Colombo, well away from the area of military activity.

The twenty-one months of detention which commenced three days after petitioner arrived in Colombo cannot be found to be part of an investigative process. True, petitioner and her husband were questioned and tortured once again. However, no charges were brought against them; they were never taken before a judge or magistrate. They were simply held until August 1994 when once again a bribe secured their release.

It is significant to note that these events took place during a period when the State Department and international monitoring agencies found that there had been a decline, but not an end, to extrajudicial detentions, deaths and disappearances of Tamils inflicted by government agencies or groups in whose

conduct government agencies acquiesced or which the government failed to prosecute.

Even after petitioner's release in August 1994, word came to her in-laws that the armed forces were again looking for her and her husband, leading to their decision to leave the country. While petitioner was waiting in the airport to depart, her husband disappeared without trace.

What happened to petitioner and her husband was not violence occasioned by LTTE's war against the government. It was not part of a government investigation. It was persecution pure and simple.

Both the context in which the persecution of petitioner took place (which the BIA ignored altogether) and petitioner's account of her arrests, torture and detentions (which the BIA accepted as true) demonstrate that the persecution was caused by the fact that petitioner and her husband were Tamils and because her husband had once been a supporter of the Tamil Tigers.

It is unnecessary to summarize again the evidence in the record providing a history of anti-Tamil activities of the Sri Lankan government, government agencies and Sinhalese vigilante groups extending from 1948 to the present day. Suffice it to say that this evidence demonstrates that the BIA's finding that "[t]he government of Sri Lanka does not persecute Tamils on account of their ethnicity or their political opinion" is insupportable.

The record demonstrates that the actions against petitioner and her husband were because they were Tamils and because he had been a Tamil Tiger.

When the Indian Peace Keeping Forces members came to petitioner's home in September 1988, they were accompanied by representatives of the Eelam People's Revolutionary Liberation Front. The EPRLF members informed the IPKF that petitioner and her husband supported and helped the Tamil Tigers. This resulted in their arrest, torture and nine months' detention.

When they were released in May 1989, petitioner and her husband were warned not to help the Tamil Tigers or do any type of work for them, a warning which they took to heart.

In November 1992, three days after petitioner arrived in Colombo in overwhelmingly Sinhalese territory, Sri Lankan soldiers arrived at petitioner's lodge and inspected her and her husband's identification papers. Ascertaining that they were Tamils from Jaffna, the soldiers accused them of being Tamil Tigers, arrested them and held them without charges for twenty-one months.

■ It does not matter for present purposes that petitioner had never been active in the cause of the Tamil Tigers. Her husband unquestionably had been active in that cause, and she was persecuted because his views were attributed to her.

■ A person may be persecuted for a political opinion she actually holds, or she may be persecuted because of an opinion her persecutor erroneously attributes to her. Persecution on account of an imputed political opinion will suffice. *Canas–Segovia v. I.N.S.*, 970 F.2d 599 (9th Cir.1992); *Beltran Zavala v. INS*, 912 F.2d 1027 (9th Cir.1990). In the present case, the only rational conclusion is that petitioner became a victim of the authorities because of her husband's past political activities.

The BIA does not seriously challenge the threat to petitioner's life or freedom should she return to Sri Lanka. The BIA simply found that the threat is not on account of petitioner's race, religion, nationality, membership in a particular social group, or political opinion.

Several factors establish that there is a clear probability of persecution should petitioner return to her native land: (i) her successive arrests; (ii) the brutal treatment to which she was subjected during the lengthy periods of confinement; (iii) the recent occurrence of the second arrest and confinement, notwithstanding the official espousal of more benign policies towards Tamils and detainees; (iv) the warnings which petitioner and her husband received when they were released in August 1994 to the effect that members of the armed forces were again looking for them, and (v) the mysterious disappearance of petitioner's hus-

band as they were about to board the plane which would take them from the country.

I have concluded that the evidence requires a finding that the past actions taken against petitioner were on account of petitioner's race and her husband's political opinions which were imputed to her; the BIA's findings leading to a contrary conclusion cannot be supported in the record. There is every reason to believe that future persecution would be for the same reasons. Petitioner has demonstrated a clear probability of persecution based on at least two of the five statutory grounds listed in 8 U.S.C. § 1253(h)(1)—race and political opinion. Therefore, she may not be deported to Sri Lanka.

It follows that petitioner, having established her entitlement to the protection of 8 U.S.C. § 1253(h)(1), has necessarily met the less stringent standard for asylum, i.e., a well-founded fear of persecution because of her race and political opinion. 8 U.S.C. § 1158(A), 8 U.S.C. § 1101(a)(42)(A).

## IV. *CONCLUSION*

Petitioner has established that she is entitled to the issuance of the writ of habeas corpus. The parties are requested to submit an appropriate form of order. If agreement on the form of order cannot be reached, a hearing will be held on June 26 at 9:00 a.m. to settle the terms of the order.